MORGENTHAU, Secretary of Treasury, et al. v. MIFFLIN CHEMICAL CORPORATION.*

Nos. 6362, 6363.

Circuit Court of Appeals, Third Circuit.

Sept. 29, 1937.

Rehearing Denied Dec. 11, 1937.

*Rehearing denied 94 F.2d 550.

J. Cullen Ganey, Acting U. S. Atty., of Bethlehem, Pa., and Blair M. Ilderton and Julian R. Eagle, both of Philadelphia, Pa., Alcohol Tax Unit, Bureau of Internal Revenue, for appellants.

Harry Shapiro, of Philadelphia, Pa., for appellee.

Before BUFFINGTON, THOMPSON and BIGGS, Circuit Judges.

BIGGS, Circuit Judge.

These two cases, since they are based upon substantially the same facts, will be considered in one opinion. The appellee, Mifflin Chemical Corporation, by bills of complaint filed in the court below, alleged that it was the holder of Federal Permit No. SDA—PA—70, which authorized the withdrawal of 9,150 wine gallons of various formulæ of specially denatured alcohol per calendar month and its use in the manufacture of a large number of preparations and also the withdrawal of 24,000 wine gallons of specially denatured alcohol formula 23—G per calendar month and its use in the manufacture of a rubbing alcohol compound; that this permit is temporary in nature and was issued on March 27, 1936, superseding a permanent permit which had theretofore been held by the appellee. The bills of complaint further allege that the appellee had been making a recognized brand of rubbing alcohol compound since the year 1921 when the United States first had authorized withdrawing specially denatured alcohol for such use, and had invested

a large sum of money in advertising the "Mifflin" brand of rubbing alcohol compound and in equipping plants for its manufacture; and that throughout the entire period of the manufacture of this brand the appellee has conformed faithfully with all laws and regulations of the United States relating to such manufacture. The appellee further alleges that the appellants, on May 6, 1936, caused a citation to issue against the appellee to appear before Edward C. Dougherty, Esquire, the supervisor of the Alcohol Tax Unit for the Philadelphia District, to show cause why its permit should not be canceled. The grounds alleged in the citation as the basis for cancellation of the appellee's permit are the grounds alleged by the district supervisor for the refusal of the 1937 permit to the appellee. In order that there may be no confusion in respect to the issues involved, the charges of the citation are set out as an appendix to this opinion. They relate to the period from May 1, to December 30, 1935, and, briefly, are as follows: That the appellee knowingly, unlawfully, and wilfully sold rubbing alcohol compound to certain named persons, firms, and corporations in quantities in excess of their respective reasonable requirements; that the appellee knowingly, unlawfully, and wilfully sold rubbing alcohol compound under such circumstances as would lead an ordinary and prudent person to know that this alcohol was not to be used for lawful, tax-free purposes; that the appellee itself diverted or connived at the diversion of certain quantities of its rubbing alcohol compound to other than lawful, tax-free purposes; that the appellee sold its rubbing alcohol compound to certain companies not within the classes authorized by law; and, last, that the appellee had conspired with named persons to divert quantities of its rubbing alcohol compound to other than lawful, industrial, tax-free purposes. The bill of complaint in the first case, No. 6362, alleges that though none of these charges was corroborated by evidence nonetheless the appellee's license was revoked by order of the district supervisor and that such order was arbitrary and capricious. The appellee thereupon prayed the District Court to order the appellants to restore the canceled permit to it and to restrain the appellants from interfering with the appellee's withdrawal of specially denatured alcohol in accordance therewith. In the bill of complaint in the second suit, No. 6363, the appellee prayed that the District Court order the appellants to approve the appellee's application for a permit for the year 1937 and to grant this permit in accordance with the terms of its application. Answers were filed by the appellants, and, upon consideration of the bills, the answers, and the proofs offered by the parties, the learned District Judge found in favor of the appellee and ordered the appellants to reinstate the 1936 permit, to grant the 1937 permit, and to allow to the appellee all rights and privileges to be enjoyed thereunder. From the decrees of the District Court, these appeals are taken.

The learned District Judge in his opinion sur trial hearing on bill, answer and proofs, in the case relating to the revocation of the 1936 permit, stated in part as follows:

"The reason given for revoking the permit held by the plaintiff is that it has sold to those known as 'boot-leggers.' If this were the controlling fact it must be found. The second fact is however the controlling one. This is that the plaintiff had made such sales knowingly and wilfully. This fact we cannot find. It is an admitted fact that the plaintiff having suspicion of the good faith of some purchasers from them notified the alcohol unit of their suspicions. This would negative any evil purpose of their own in making the sales.

"We think the finding made by the Permit Authorities of bad faith on the part of the plaintiff is unwarranted by the evidence.

"We further find that a sale by the plaintiff not made in bad faith does not justify a revocation of the permit held by it."

We believe that it will prove helpful if we proceed first to a statement and discussion of the facts in these two cases and then proceed to rule specifically upon the questions of law presented. We should state, however, that in view of the standing of the appellee, Mifflin Chemical Company, we have subjected the record to exceptional scrutiny.

The hearer, appointed by District Supervisor Dougherty to hear and pass upon the questions involved in the citation, made specific findings of fact. He found that the appellee had not in good faith conformed to the provisions of the internal revenue and industrial alcohol law and regulations, in that it did in bad faith:

"1. Between May 1, 1935, and December 30, 1935, knowingly, unlawfully and wilfully sell six thousand, two hundred and thirty-eight and one-half (6,238½) gross of pint

bottles containing rubbing alcohol compound, manufactured from specially denatured alcohol withdrawn under its permit, to sixteen concerns in and about New York City, in the quantities indicated in the * * * summary of Government's evidence (as made by the Hearer), which quantities were in excess of their reasonable requirements.

"2. Between May 1, 1935, and December 30, 1935, knowingly, unlawfully and wilfully sell five hundred (500) gross of pint bottles containing rubbing alcohol compound, manufactured from specially denatured alcohol withdrawn under its permit, to the Johnson Wholesale Drug and Perfumery Company, New ,Haven, Connecticut, which quantity was in excess of its reasonable requirements.

"3. Between May 1, 1935, and December 30, 1935, knowingly, unlawfully and wilfully sell two thousand, eight hundred and one and one-half (2,801½) gross of pint bottles containing rubbing alcohol compound, manufactured from specially denatured alcohol withdrawn under its permit, to twenty-nine concerns in and about Philadelphia, Pennsylvania, in the quantities indicated in the * * * summary of government evidence (as made by the Hearer) which quantities were in excess of their reasonable requirements.

"4. Between May 1, 1935, and December 30, 1935, knowingly, unlawfully and wilfully sell one hundred and seventy-one thousand, seven hundred and twenty (171,720) gallons of rubbing alcohol compound referred to in the foregoing first, second and third findings of fact, under such circumstances as would lead an ordinary and prudent person to know that said rubbing alcohol compound was not to be used for lawful, industrial, tax free purposes.

"5. Between May 1, 1935, and December 30, 1935, diverted or connived at the diversion to other than lawful, industrial, tax-free purposes the two hundred and forty thousand, four hundred and eight (240,408) proof gallons of ethyl alcohol contained in the rubbing alcohol compound referred to in the foregoing first, second and third findings of fact.

"6. Between May 1, 1935, and December 30, 1935, sell rubbing alcohol compound manufactured from specially denatured alcohol withdrawn under its permit, to Ace Drug Products Company of New York City, which company was not within the class authorized as purchaser of rubbing alcohol compound as provided by the second paragraph of Article 146 of Regulations 3.

"7. Between May 1, 1935, and December 30, 1935, through its employees and agents, conspire with Sam Waldman, alias Sam Wagner, alias 'Sam, the Alcohol Man,' Lou Goldstein, alias Lou Gold, Nat Glanzburg, Herman Kronberg, Barney Fisher, Jacob Gatker, H. Meyer, alias Bruno Meyers, and others, to divert to other than lawful, industrial, tax free purposes two hundred and forty thousand, four hundred and eight (240,408) proof gallons of ethyl alcohol, contained in the rubbing alcohol compound referred to in the above first, second and third findings of fact."

Upon these findings the hearer, as we stated previously, reached the conclusion of law in one case that the permit of the appellee for 1936 should be canceled and revoked. The district supervisor, acting for the Commissioner of Internal Revenue, thereupon canceled the appellee's 1936 permit and refused to issue the 1937 permit to the appellee.

The appellee was an old and well-established concern. It was founded by Phillip Publicker as an outlet for the surplus alcohol of the David Berg Industrial Alcohol Company, which was organized by Phillip Publicker in the year 1911. Prior to the occurrence of the events complained of by the appellants, Phillip Publicker turned the active management of the appellee over to his son, Theodore, who at the time of the taking of testimony before the hearer was about twenty-six years old. The appellee, when Theodore Publicker came into charge of its affairs, underwent a change in policy. Formerly, it had sold quantities of a high grade and expensive brand of rubbing alcohol under the name "Mifflin" as a brand. It had devoted little attention to the development of sale of so-called "dealer" brands. The practice of selling rubbing alcohol compound under "dealer" brands is a common commercial practice. Under that practice rubbing alcohol compound is manufactured in the usual fashion but the bottle or container in which it is to be sold is labeled with the name of the individual wholesaler, retailer, or dealer. Following the change in policy referred to the appellee began to devote a good deal of attention to the sale of the dealer brands, which were cheaper, and to the sale of the C. M. Brown brand sold through the medium of the C. M. Brown Sales Company, a subsidiary company to the appellee. The nature of this

change of policy was explained by David Muchnick, the salesman of the appellee in charge of the Philadelphia area, as follows: " * * * at that particular time the Mifflin Chemical Company had change of policy I have been advised by Mr. Taback about it; that they were eliminating a lot of small drug accounts and were anxious only to sell drugs to more desirable accounts, by that I mean the larger accounts and those with the good financial standing, and the small accounts should be taken care of through the wholesale and distributing channels." The results of this change of policy were quite startling. In January and February, 1935, the appellee withdrew only 32,000 gallons per month of specially denatured alcohol, but in the month of May a great increase took place, and in the words of the appellee's production manager, Brown, this "large increase was confined largely in the eastern section (of the United States), particularly in the New York area, Pennsylvania, right around Philadelphia, and one spot in New England * * * it seemed to come all through about one or two months, from about May, the time the formula was changed until near the latter part of 1935. * * *" Mr. Brown then proceeded to state that in his opinion this increase was due to purchases made by regular customers of the appellee who wished to store the rubbing alcohol compound to protect themselves from a contemplated change in formula and an increase in price, that the Mifflin Corporation was able to contact a number of large jobbers in the New York territory, and finally to the fact that certain other manufacturers of rubbing alcohol compounds had withdrawn from the field. The record shows, however, that the consumption of industrial alcohol by the appellee substantially tripled, beginning about the month of May, 1935, and continuing until about December, 1935, when investigators of the Bureau of Internal Revenue commenced to contact its customers. Approximately 80 per cent. of the appellee's business was in the manufacture and sale of rubbing alcohol compound. The Mifflin Company sold hundreds of gross of rubbing alcohol compound of dealer and C. M. Brown brand to new customers who were contacted and induced to purchase by alcohol racketeers in the Philadelphia and New York areas. Throughout the period from May, 1935, until December, 1935, when the Treasury Department investigated the appellee and its customers, sales' volume remained trebled. It is admitted by

responsible officers of the appellee that the reason for the great increase in sales of its rubbing alcohol compound was that it was falling into the hands of alcohol racketeers and was being diverted.

The appellee employed a salesman in each of the three territorial areas referred to in the citation, namely, Philadelphia, New York, and New England. Sales of the rubbing alcohol compound were made by the two salesmen in the Philadelphia and New York areas apparently upon no other basis than who would buy it. Brown, the production manager of the appellee, and Theodore Publicker, its chief executive, make reference to a checkup of customers made by them through an examination of druggists' lists and credit ratings. It seems to us, however, that even a superficial checkup of customers of the appellee by these officers would have disclosed the nature of the sales made and have satisfied Brown and Publicker that rubbing alcohol compound was being sold in quantities far beyond the reasonable requirements of the appellee's customers and that the alcohol was, in all probability, being made subject to diversion.

We deem it advisable at this point to set out certain specific evidence upon which these conclusions and others are based. It seems appropriate to begin with reference to certain of the sales made in the Philadelphia area. The record shows that rubbing alcohol compound manufactured by the appellee was being purchased and sold in large quantities to customers whose requirements of rubbing alcohol until May, 1935, had been normally slight. The record indicates that in Philadelphia two individuals, by names, Nat Glanzburg and Lou Gold or Goldstein, operating apparently in conjunction with Samuel Waldman, sometimes known as Sam Wagner or "Alcohol Sam," and certain others in New York City, were diverting substantial quantities of the rubbing alcohol compound manufactured by the appellee. The procedure employed by these alcohol racketeers was to have the rubbing alcohol compound ordered from Mifflin by a jobbing house or store and then by fictitious sales cause the rubbing alcohol compound to be delivered to themselves or their agents. The rubbing alcohol compound was picked up by trucks operated by these racketeers and delivered to so-called "drop" houses. The number of illicit stills substantially increased. Acetone came on the market at a cheap rate and in an inferior

quality. There was testimony by Connor, a government agent, that on several occasions he saw trucks of the Phillip Gerber Trucking Company load rubbing alcohol compound manufactured by the appellee and labeled C. M. Brown Rubbing Compound at Newhoff's Cut Price Store, Post's Cigar Store, Lakoff Cut Price Store, and David Master's Drug Store, all in Philadelphia. This witness testified that he saw Glanzburg present and attendant upon these deliveries upon occasion and that he saw the trucks of the appellee deliver the rubbing alcohol compound to the sidewalk in front of these stores. Connor also testified to the connection between Glanzburg and Gold and Three Star Chemical Company to which Muchnick, the appellee's salesman for the Philadelphia area, frequently resorted. Connor also stated that upon December 9, 1935, he observed a truck, known to him as one of Gerber Company's trucks, pull into the rear of the Three Star Chemical Company's premises. The driver of this truck was observed by him to go inside the premises, emerge in a few minutes, and then proceed to the loading platform of the P. & P. Transportation Company in Philadelphia. That he then saw rubbing alcohol compound transferred from the Gerber truck to a truck of the P. & P. Transportation Company. The cartons so transferred were marked with the number 1537. Connor also testified that on December 18, 1935, in Philadelphia, he observed two P. & P. Transportation Company trucks used to pick up a number of cartons labeled 1537 and marked "C. M. Brown Rubbing Alcohol." These trucks were traced by investigators of the Alcohol Tax Unit to Hammonton, N. J., where they entered the P. & P. Transportation Company garage. Shortly after these occurrences and on January 20, 1936, a still was located by revenue agents upon premises on Oak road, near Hammonton, N. J. At this still were found empty bottles obviously used to contain rubbing alcohol compound and marked C. M. Brown Sales Company. Edward H. Ward, another investigator of the Alcohol Tax Unit, testified that he had investigated a garage near Hammonton and there had discovered a large number of empty cases marked C. M. Brown Sales Company. Samples of alcohol taken from stills in this neighborhood were analyzed and the first fractions contained acetone and denaturants of formulæ 23—A and 23—G, formulæ employed by the appellee for the manufacture of its rubbing alcohol compound.

The appellee seems to have made little or no investigation of prospective customers, and frequently shipped substantial quantities of the rubbing alcohol compound collect on delivery. A shipment of 25 gross of the rubbing alcohol compound was so made to Baizer, of Philadelphia, upon October 7, 1935. Baizer had no credit rating with the appellee and so far as the record shows was unknown to it. The order was telephoned to the appellee and the commission upon the sale was credited to Muchnick, the appellee's salesman in the Philadelphia territory. The dealings had with the appellee by Allen, of Allen Brothers, a small firm in Philadelphia, are typical. Allen states that he received a telephone call from a man who named himself as Gold, stating that he desired to purchase rubbing alcohol compound. He procured the rubbing alcohol compound from the appellee and sold 46 gross thereof to Gold during the month of December, 1935. The rubbing alcohol compound would be stored in the garage maintained by Allen Brothers and picked up by a truck sent by Gold within a short time. On each occasion some individual would be present to instruct the truckers and to pay in cash for the merchandise. Baylin, of Philadelphia, testified that in the year 1935 he purchased 60 gross of its rubbing alcohol from the appellee, that he had sold 50 gross thereof to an unknown purchaser, and that he received a profit of 75 cents a gross on the transaction. Until this time he had never purchased more than 3 gross of rubbing alcohol upon any single occasion. A $50 deposit was given Baylin by the unknown purchaser to induce Baylin's purchase from the appellee. Roslyn Blatt, of F. Blatt, Inc., of Philadelphia, testified that Gold appeared and desired to buy 25 gross of rubbing alcohol compound. This was ordered from the appellee by Blatt by telephone. The rubbing alcohol compound was taken from the Blatt store by Gold upon the very day that it was received from the appellee collect on delivery. It should be noted that Blatt realized that there was something wrong with his transactions with Gold and so testified. He stated that the profit "was too big" to be legitimate and therefore canceled other orders which he had received from Gold. The affidavit of John Breslen, also of Philadelphia, states that Fisher, who was acting with Glanzburg, offered him a commission of 50 cents and 75 cents per gross for the purchase and sale of rubbing alcohol compound. He stated that he believed that Fisher secured

a number of his order blanks and using these blanks procured 85 gross of rubbing alcohol compound, a large part of which was that manufactured by the appellee. Hahn, of E. & H. Cut Rate Store of Philadelphia, testified that at the request of Fisher he purchased 25 gross of C. M. Brown alcohol which was billed to him by the appellee collect on delivery, and that Fisher or the truck driver paid him for this merchandise in cash. Jacob Davis, a wholesale druggist of Philadelphia, testified that he bought 100 gross of rubbing alcohol compound manufactured by the appellee, that he purchased such a large quantity because he had received a letter from the Mifflin Company stating that the price of the commodity was going up, but it should be noted that approximately 60 of this hundred gross so procured were sold by him to some unknown person. Normally Davis' dealings in rubbing alcohol compound were very small. Schwartz, of Frank & Seder, testified that Gold came to him and asked him to procure for him 25 gross of Mifflin rubbing alcohol compound, that Gold left a $25 deposit with this order and offered Schwartz a dollar a gross profit to buy it for him. Suspecting the nature of this transaction, Schwartz immediately communicated with Theodore Publicker, who made no comment upon the transaction other than to ask if Frank & Seder had handled alcohol in the past. An almost similar transaction took place in respect to Sears-Roebuck & Co., and again Publicker was informed.

Bruno, a truck driver employed by the racketeers in Philadelphia, states in his affidavit that he picked up rubbing alcohol compound from Integrity Magnesia Company, Newhof's Post Cigar, Lakoff's, Nevin's, Manufacturers Drug Distributing Company, Sears-Roebuck & Co., David Master's Store, all substantial purchasers from the appellee, and that the rubbing alcohol compound so procured was taken for dumping to a warehouse connected with Cramps Shipyard; that he hauled rubbing alcohol compound marked "C. M. Brown" with the number 1537—C printed in black letters upon the cartons. Bruno, by his affidavit, traces rubbing alcohol compound to the P. & P. Transportation Company, of Hammonton, N. J. He states that he transported rubbing alcohol compound to the Quaker City Jobbing Company and that he delivered acetone, a by-product of cleansing alcohol, to named purchasers. There is a very strong inference that the rubbing alcohol compound of the appellee was being cleansed and sold for beverage purposes, but there is no direct proof upon which as a matter of law this conclusion may be based.

The dealings which took place with the rubbing alcohol compound of the appellee in the Philadelphia area occupy many pages of the record. It is not necessary to further detail them here. We are forced to the conclusion that by far the greater part of the rubbing compound sold by the appellee in the Philadelphia area from May, 1935, to December, 1935, inclusive, was beyond the reasonable requirements of the purchasers listed upon the citation.

Did the appellee have knowledge, or should it have had knowledge, that the quantities of its rubbing alcohol compound sold by it in the Philadelphia area were beyond the reasonable requirements of the customers as listed upon the citation? The findings of the hearer are referred to in this connection. We are of the opinion that there is sufficient evidence to support the findings of the hearer in this respect. We will deal specifically hereafter with the findings and orders of the supervisor based thereon, but we think that the evidence shows that not only should the responsible officers of the appellee have had knowledge that its rubbing alcohol compound was being sold beyond the reasonable requirements of the appellee's customers, but that such knowledge is fairly indicated by the record. There is testimony which connects Muchnick, the appellee's salesman in the Philadelphia area, with the racketeers Glanzburg and Gold. Emanuel Newhof, of Newhof's Store, in Philadelphia, upon oath states that each time his company procured an order for Glanzburg he himself informed Muchnick of it. We particularly note evidence which indicates that the racketeers seemingly had knowledge of the time of the delivery of orders by appellee to its purchasers. It appears from the record that some of the small houses dealing in large quantities of the rubbing alcohol compound manufactured by the appellee were aware that the alcohol so purchased by them was probably being put to illegal uses. We cannot believe that the appellee itself did not have knowledge equal to that of its purchasers of the market conditions under which its product was being sold.

What we have said in respect to the Philadelphia area, we might repeat in regard to the New York area. The concern

which flagrantly disposed of appellee's rubbing alcohol compound in such a manner as to lead one to the conclusion that it was subject to diversion was Ace Drug Products Company, which operated in conjunction with and for all practical purposes subject to the control of Mills Sales Company. A Miss Weiss, formerly employed by Mills Sales Company as a clerk or secretary, testified that she was the president of the Ace Company. In the period from September 3, to September 15, 1935, inclusive, her company received approximately 735 gross of C. M. Brown rubbing alcohol compound from the Mifflin Company. From September 21, to November 18, 1935, inclusive, Miss Weiss' company purchased from Mills Sales Company 960 gross of rubbing alcohol compound of the C. M. Brown brand. Ace Company had commenced to do business in February or March, 1935, with a capital of $10,000. Miss Weiss stated as follows: "Before I handled rubbing alcohol, someone came in from the Mifflin Company, but I did not pay any attention, because I did not know anything about it, did not have many calls for it and did not get prices on it, and did not know market value, so I just forgot about it. But after I had had so many calls for it I called them in and they gave me a price. They said they would work with me." The record indicated that Ace Company sold 500 gross pints of rubbing alcohol compound manufactured by the appellee within a period of less than two weeks from August 30, to September 9, 1935. Miss Weiss was unable or unwilling to explain her company's success in this line of business. Most of the sales of rubbing alcohol compound made by Miss Weiss were to two men who supplied her with lists of customers to whom, they told her, she was selling the rubbing alcohol compound.

The testimony of David Jacoby of the Mills Sales Company, of New York, in respect to his partnership's purchases and sales of rubbing alcohol compound manufactured by the appellee is as uncertain and evasive as that of Miss Weiss. It appears that frequently shipments of rubbing alcohol compound ordered by Mills Sales from the appellee were sent to the Ace Company. Some shipments were sent by Mills Sales to warehouses. In these transactions Harry Taback, the salesman of the appellee in the New York area, frequently appears. Jacoby testified that cartons of the rubbing alcohol compound ordered by Mills Sales were diverted to the Ace Company on Taback's instructions. The record indicates that Jacoby told Taback to ship whatever he could of the rubbing alcohol compound and upon at least one occasion rubbing alcohol compound manufactured by the appellee was delivered upon the sidewalk of Mills Sales and immediately picked up and taken away by trucks operated by alcohol racketeers. At least 1,000 gross pints of rubbing alcohol compound were sold by the appellee to Mills Sales between September 21, and November 18, 1935. Jacoby read into the record nineteen names of persons, firms, or corporations to whom his firm sold rubbing alcohol compound. Some of these customers, if actually existing, made purchases far beyond their reasonable requirements. Jacoby testified that the appellee upon occasion refused to ship to Mills Sales and to Ace Company because its supplies of available alcohol had been exhausted.

Mintz, a partner in Ross Products Company of New York, states in his affidavit that Taback told him that Ross Products Company was ill advised to bill rubbing alcohol compound in large amounts; that it should be billed in small quantities in order to make it appear that regular or average customers were giving orders which were being duly filled. The affiant also states that Taback informed the partners of Ross Products Company that they should not ship rubbing alcohol compound from the sidewalk, but that it should first be brought into their store.

Rubbing alcohol compound manufactured by the appellee was stored frequently in the Sunset Warehouse in New York. Robert E. Dunn, the president of this organization, testified that the appellee actually made the contract or agreement for storage of these goods. The cartons of rubbing alcohol compound so stored were delivered to Cliffside Motor Freight upon the telephone instructions of a man called "Sam," who was actually Sam Wagner, or "Alcohol Sam," referred to heretofore. Wagner paid the storage charges due to the warehouse company. This warehouse upon one occasion received 600 cartons of rubbing alcohol compound shipped by the appellee. These goods had been consigned to the account of Ace Company, but were delivered to Wagner upon a bearer order. Such a transaction serves to indicate a connection between Ace Company, Wagner and the appellee. Taback sold and the appellee delivered over 400 gross of rubbing alcohol compound to Marinbach Drug Com-

pany between June 27, and December 31, 1935. This company was of small capital and newly in business. Marinbach testified that though he had no definite sales for the appellee's rubbing alcohol compound nonetheless he had "anticipations." Taback arranged that a substantial part of these orders should be quickly taken off his hands. Marinbach, however, insisted on written orders, stating in this connection: "all this had been taking place in a few days and this overwhelming amount of business and I wanted to trace it back for my own use and good, and so I wanted something to show for it."

We deem it unnecessary to pursue the record of transactions in the New York area further. But there is, in our opinion, sufficient evidence to support the findings of the hearer as hereafter specifically noted.

One other fact situation remains which we will deal with briefly. Theodore Publicker sold to Johnson Wholesale Drug & Perfumery of New Haven, Conn., 862 gross pints of the rubbing alcohol compound manufactured by the appellee. Of this amount 500 gross were sold by the Johnson Company to one Jacob Borson. Borson in turn sold the alcohol to a person giving a fictitious name. The Johnson Company was and is a large wholesale drug house with numerous customers. We are of the opinion that the sale by the appellee of 500 gross of the 862 gross of rubbing alcohol compound referred to was beyond the reasonable requirements of the purchaser, Johnson Company, but we think that the evidence is insufficient to support a conclusion that this fact was known or should have been known to the appellee.

In order that there may be apparent to some extent the quantities of alcohol herein involved, we state that the rubbing alcohol compound manufactured by the appellee is approximately 70 per centum ethyl alcohol and that a gross of pint bottles containing such product is 18 gallons.

Before passing upon the specific findings of the hearer and the orders of the district supervisor based thereon, it seems desirable at this point to discuss in some detail the questions of law involved. The bills of complaint each recite: "Notwithstanding the fact that the charges of the citation were not proved and were, in fact, conclusively denied by the evidence produced at the said Hearings, the Hearer, thereafter recommended that the permit of the complainant be revoked and on July 30, 1936, the defendant, Edward C. Dougherty, revoked the permit then held by the complainant." The bill of complaint in the suit brought by the appellee to compel the issuance of the 1937 permit to it alleges: "On December 23, 1936, the defendant, Edward C. Dougherty, District Supervisor, in a letter addressed to complainant, disapproved the said application, citing as reason therefor precisely the same charges contained in the citation * * * which was the basis of the said revocation proceedings. * * *" The question in both cases therefore becomes: Were the charges of the citation, or any of them, supported by such evidence that the hearer and the supervisor, acting upon the hearer's report, might find them to be true without such finding being arbitrary or capricious?

We conceive the law to be that if the findings of the hearer, or sufficient of them, are supported by adequate evidence, then the orders of the supervisor based thereon must in turn be approved by the reviewing court. In so holding, we follow the rule of law enunciated by the Supreme Court in Ma-King Products Company v. Blair, 271 U.S. 479, 46 S.Ct. 544, 70 L.Ed. 1046, and by the ruling of this court in Blair v. Graupner (C.C.A.) 29 F.(2d) 815. We are aware that the statute law applicable to the cases at bar is not contained in the National Prohibition Act, under which the two cases referred to were decided, but in the Liquor Law Repeal and Enforcement Act, c. 740, 49 Stat. 872–876 (27 U.S.C.A. §§ 151–167). This court, in Helvering v. Druggists' Specialties Company, 76 F.(2d) 743, passed upon the provisions of the National Prohibition Act (title 2, §§ 4, 9, 27 U.S.C.A. §§ 13, 21; title 3, § 1 et seq., 27 U.S.C.A. §§ 63, 71 et seq.; Const.Amend. 18) after the repeal of the Eighteenth Amendment, and held that notwithstanding the repeal of that amendment the Commissioner had discretion to revoke an industrial alcohol permit because of the belief, well-founded on his part, that the permittee thereunder would sell illegally potable alcohol. By its decision in that case this court reiterated the principle originally enunciated by it in Blair, Commissioner, v. Graupner, supra, but in protection of the revenue. A question analogous to that presented in the second case at bar (No. 6363) and under the identical statute with which we are here concerned is passed upon in the decision of the United States District Court for the Southern District of New York, Purepac Corporation

v. Helvering, 14 F.Supp. 897, 898. In this decision Judge Patterson held: "Under the former National Prohibition Act, the Commissioner had the responsibility of seeing to it that permits to deal in alcohol for nonbeverage uses were issued only to trustworthy persons. The only function of a court of equity in reviewing his refusal to issue a permit was to determine whether his action was based on error of law or was wholly unsupported by the evidence. Ma-King Products Co. v. Blair, 271 U.S. 479, 46 S.Ct. 544, 70 L.Ed. 1046. The Commissioner's power and responsibility in respect to permits are as broad under the present law, notwithstanding that now the purpose is protection of the revenue rather than prohibition of intoxicating liquors. Helvering v. Druggists' Specialties Co. * * * The question then is whether it can fairly be said that the Commissioner's refusal was founded on error of law or had no support in the evidence."

We deem the ruling above stated to be correct, and adopt the principle there enunciated to the cases before us.

■ In respect to the issuance of permits such function can be exercised by the United States only through its appointed agents, and a person or corporation accepting such permit is bound to exercise good faith to the appointing power. He who holds a permit is in the nature of a trustee. The Commissioner issuing a permit must rely upon the good faith of the permittee, and if the permittee breaches that faith the Commissioner has no mere clerical mandatory duty of again issuing a permit to a person or corporation who may again break the law or permit it to be broken through his breach of trust. On the contrary this officer of the government has the discretionary and responsible duty of considering all facts and the law before issuing a permit. The principle here enunciated was first set forth by this court as follows in Ma-King Products Co. v. Blair, 3 F.(2d) 936, 937, wherein it was stated: "The holder of such a permit is intrusted by the government with a power which subjects him to the approaches and bribes of law-breakers."

The court states in the same opinion: "Congress meant the Commissioner was to have, not the mere mandatory clerical duty of signing a permit, but the discretionary and responsible one of considering facts and law before he determined whether he would permit manufacture."

To almost similar effect is the ruling of the court in Westmoreland Brewing Company v. United States (C.C.A.) 294 F. 740.

The citation in what we have designated as the first case (No. 6362) makes seven charges. The findings of fact of the hearer support these charges, and upon these findings of fact the supervisor revoked the 1936 permit of the appellee and refused its 1937 application. We will now proceed to deal specifically with the charges and the findings of the hearer in respect thereto.

■ Four charges (1, 2, 3, and 6) of the citation are based on article 146 of Regulations 3, promulgated under title 3 of the National Prohibition Act, re-enacted by Treasury Decision 4541. The article referred to provides, in brief, that sales to persons in excess "of their reasonable requirements will constitute bad faith on the part of the vendor and grounds for the revocation of his permit," and also designates the persons to whom rubbing alcohol compound could be legally sold by the appellee. The citation also charges (4) that the appellee sold stated quantities of rubbing alcohol compound under such circumstances as would lead an ordinary and prudent person to know that this was not to be used for lawful, industrial, tax-free purposes, and diverted or connived generally (5) and with certain named persons (7) at the diversion of stated quantities of ethyl alcohol contained in its rubbing alcohol compound. These are charges of violation of the Industrial Alcohol Acts of June 7, 1906, §§ 1, 2, 34 Stat. 217, (26 U.S.C.A. §§ 1320(a), 1322, 1323) and of October 3, 1913, § 4, N, subsec. 2, 38 Stat. 199, and of section 7, title 1, of the Liquor Law Repeal and Enforcement Act (27 U.S.C.A. § 156).

We rule that there is sufficient evidence to support the first, third, and sixth findings of fact of the hearer, and that these findings are neither capricious or arbitrary. We cannot support the second finding of fact of the hearer for the reasons heretofore given. In his fourth finding of fact the hearer finds that the appellee sold certain quantities of the rubbing alcohol compound manufactured by it under such circumstances as would lead the ordinary and prudent person to know that it was not to be used for lawful, industrial, tax-free purposes. The circumstances under which the rubbing alcohol compound was sold by the appellee were such as would lead the ordinary, prudent person vehemently to suspect

that the alcohol was not to be used for such proper purposes and to cause that person to believe with belief that would be almost implicit that the alcohol was not to be so used, but he could not know this unless that knowledge came from facts outside the record. For almost similar reasons, we reject the fifth finding of the hearer. We believe that the record contains evidence to support a most positive belief that the appellee connived, that is to say, shut its eyes, at the probable diversion of its product, but the record does not prove that the stated quantity of ethyl alcohol was in fact diverted. The circumstances of its disposition are such that the hearer could well have suspicion that was almost a certainty, but that suspicion will not justify the finding of the fact. In respect to the seventh finding of fact by the hearer we cannot find sufficient evidence upon the record of these cases to support this finding. We shall make no further comment in this respect.

■ We hold that the rulings of the district supervisor in revoking the 1936 permit of the appellee and in rejecting its 1937 application may be supported, and are as a matter of law justified by the three findings of fact by the hearer which we have approved.

Other questions, however, are raised by the appellee. It contends that a permit may not be revoked for infractions of regulations by employees when the employer did not know and could not have known of the violations. In support of this proposition the appellee cites the authority of Shreveport Drug Company v. Jackson (D.C.) 2 F.(2d) 65, 70; McGill v. Mellon (D.C.) 5 F.(2d) 262, 265, and Long & Co. v. Campbell (D.C.) 28 F.(2d) 422, 424. With the authorities cited we are in accord, but the facts in the cited cases differ substantially from the circumstances in the case at bar. The issue of bad faith upon the part of the appellee was raised by every charge of the citation, and we have already indicated that we believe that three of those charges are sufficiently supported by the evidence to justify the findings of the hearer and the orders of the supervisor.

■ The appellee further contends that the revocation and refusal of its permit by the Alcohol Tax Unit were based on incompetent, inadmissible, and unfair testimony procured in violation of the appellee's constitutional rights and under threats of taxation. We have carefully considered the record in the light of this contention of the appellee,

and find that it is not supported by the facts. The citation issued pursuant to the provisions of section 7, title 1 of the Liquor Law Repeal and Enforcement Act, 27 U.S.C.A. § 156. The hearer was not engaged in the trial of a law suit when he investigated and heard the evidence adduced in respect to the charges of the citation. He was engaged in the discharge of an administrative function. That function and the relation of the Commissioner of Internal Revenue in relation to it is well described in Ossam v. Moss (D.C.) 44 F.(2d) 845, 846, wherein it was stated: "the test seems to be whether any requirement of fairness to the permittee was violated by the acceptance of the affidavit. The primary duty of the administrator, acting through his agents, is to prevent violations of the law. The effect of his decision is not to punish an offender, or to deprive him of his liberty or property; it is simply to withdraw a privilege of which the permittee is found to be unworthy." In this connection see Yudelson v. Andrews (C.C.A.) 25 F.(2d) 80, 83; U. S. ex rel. Smith v. Curran (C.C.A.) 12 F.(2d) 636, 637; Meinwald v. Doran (D.C.) 60 F.(2d) 261, 263. We think that we need dwell no further upon this point other than to say that there is no evidence upon the record to support the appellee's contention that the depositions or affidavits, or any of them, or any testimony, were procured by threats of tax prosecution. As a matter of fact a substantial portion of the testimony was introduced by stipulation.

■■ The appellee contends that case No. 6362 is moot because the permit granted to the appellee for the year 1936 has expired by its own terms without reference to its revocation by Supervisor Dougherty. We think this contention is correct, but see no reason why such a holding should serve in anywise to invalidate the decision of the supervisor or his order in the premises refusing the application of the appellee for its 1937 permit. The acts complained of by the appellants were committed by the appellee in the year 1935. Section 6 of the Liquor Law Repeal and Enforcement Act (27 U.S.C.A. § 155) provides that no permit shall be issued to any person who within one year prior to the application therefor shall not in good faith have conformed to the provisions of the act or to title 3 of the National Prohibition Act (27 U.S.C.A. § 71 et seq.). It appears therefore that it is mandatory upon the Commissioner to refuse a permit to any person who within one year prior to the application shall not have conformed

to the provisions of the Liquor Law Repeal and Enforcement Act and the National Prohibition Act, but this mandatory provision in nowise operates to deprive the Commissioner of his discretion to refuse the permit upon adequate grounds if the violation of the permit occurred more than one year prior to the making of the application. Purepac Corporation v. Helvering, supra. In case No. 6363, we hold that the supervisor, acting lawfully as agent for the Commissioner of Internal Revenue, and basing his order of rejection of the appellee's application for a permit for the year 1937 upon the testimony of record, was not acting arbitrarily or capriciously, but upon evidence sufficient to support his ruling.

The decision and order of the court below in case No. 6363 will be reversed, and the cause will be remanded, with directions to proceed in conformity with this opinion. Since we deem case No. 6362 to be moot, an order will be entered dismissing the appeal.

### Appendix.

The citation referred to issued on May 6, 1936, to the appellee, Mifflin Chemical Corporation, requiring the appellee company to appear upon May 25, 1936, and show cause why its permit, SDA—PA—70, should not be revoked on the grounds that it did:

"Between May 1, 1935, and December 30, 1935, knowingly, unlawfully and wilfully sell 6,908 gross of pint bottles containing rubbing alcohol compound manufactured from specially denatured alcohol withdrawn under your permit to the following concerns in and about New York City, in the quantities indicated below, which quantities were in excess of their reasonable requirements:

| | |
|---|---|
| Ace Drug Products Co. | 200 gross |
| Mills Sales Co. | 1,915 " |
| Caswell Massey Co. | 150 " |
| Marin Bach Drug Co. | 450 " |
| C. W. Link Drug Co. | 509 " |
| Bee Drug Co. | 300 " |
| American Mdse. Co. | 100 " |
| Ross Products Co. | 500 " |
| Ace Drug Sundry Co. | 707 " |
| E. T. Browne Co. | 100 " |
| Sheray Co. | 200 " |
| Zenith Drug Co. | 50 " |
| Capital Drug Co. | 775 " |
| Atlantic Chemical Co. | 325 " |
| Chabrowe Drug Co. | 125 " |
| Towne & James | 200 " |
| York Sales Co. | 185 " |
| Henry B. Cohen | 8 " |
| Department Sales Co. | 109 " |
| Total | 6,908 " |

"Between May 1, 1935, and December 30, 1935, knowingly, unlawfully and wilfully sell 978 gross of pint bottles containing rubbing alcohol compound manufactured from specially denatured alcohol withdrawn under your permit to the following concerns in and about Boston, Massachusetts, in the quantities indicated below, which quantities were in excess of their reasonable requirements:

| | |
|---|---|
| Johnson Wholesale Drug & Perfumery Co. | 850 gross |
| Rosenthal Tobacco Co. | 120 " |
| Total | 978 " |

"Between May 1, 1935, and December 30, 1935, knowingly, unlawfully and wilfully sell 3,133 gross of pint bottles containing rubbing alcohol compound manufactured from specially denatured alcohol withdrawn under your permit to the following concerns in and about Philadelphia, Pennsylvania, in the quantities indicated below, which quantities were in excess of their reasonable requirements:

| | |
|---|---|
| Allen Bros. | 46 gross |
| Aschenback, Miller | 100 " |
| R. Baylin | 50 " |
| F. Blatt | 25 " |
| Bradley | 15 " |
| Breslow Bros. | 15 " |
| E. Cohen | 20 " |
| E. & H. Cut Rate | 30 " |
| Jacob Davis | 25 " |
| Frank & Seder | 50 " |
| Leon Goldberg | 30 " |
| H. Sales Mfg. | 10 " |
| Hance Bros. & White | 95 " |
| B. Himmelstein | 17 " |
| Integrity Magnesia | 250 " |
| Joseph's Rapid Fire Sales | 25 " |
| Krull Drug | 50 " |
| M. Lakoff | 50 " |
| Master Pharmacy | 100 " |
| Mfg. Drug Distr. Co. | 400 " |
| Nevins Drug | 250 " |
| Frank & Black | 50 " |
| Phil Luber | 25 " |
| Lewis Newhoff | 1,000 " |
| Ridgeway Pharmacy | 25 " |
| Post Cigar | 200 " |
| Rosemar Drug | 15 " |
| Sears & Roebuck | 50 " |
| David Lubar | 25 " |
| Weiser's Pharmacy | 10 " |
| Jacob Davis | 30 " |
| Total | 3,133 " |

"Between May 1, 1935, and December 30, 1935, did knowingly, unlawfully and wilfully sell or otherwise dispose of 198,342 gallons rubbing alcohol compound referred to in paragraphs one, two and three of this citation, under such circumstances as would lead an ordinary and prudent person to know that said rubbing alcohol compound was not to be used for lawful, industrial, tax-free purposes.

"Between May 1, 1935, and December 30, 1935, divert or connive at the diversion to other than lawful industrial, tax-free purposes the 277,678.8 proof gallons of ethyl alcohol contained in the rubbing alcohol compound referred to in paragraphs one, two and three of this citation.

"Between May 1, 1935 and December 30, 1935, sell rubbing alcohol compound manufactured from specially denatured alcohol withdrawn under your permit to Ace Drug Products Company and American Merchandise Company of New York City, which companies are not within the classes authorized as purchasers of rubbing alcohol compound as provided by the second paragraph of Article 146 of Regulations 3.

"Between May 1, 1935, and December 30, 1935, conspire with Sam Waldman, alias Sam Wagner, alias 'Sam, the Alcohol Man,' Lou Goldstein, Nat Glanzburg, Herman Kronberg, Barney Fisher, Jacob Gatker, H. Meyer, alias Bruno Meyers, and others to divert to other than lawful, industrial, tax-free purposes the 277,678.8 gallons of ethyl alcohol contained in the rubbing alcohol compound referred to in paragraphs one, two and three of this citation."