### In re MIFFLIN CHEMICAL CORPORATION.

### No. 20195.

District Court, E. D. Pennsylvania.
July 24, 1940.

Harry Shapiro and Harold J. Conner, both of Philadelphia, Pa., for debtor.

J. Cullen Ganey, U. S. Atty., and J. Barton Rettew, Jr., Asst. U. S. Atty., both of Philadelphia, Pa., Julian R. Eagle and B. M. Ilderton, both of Philadelphia, Pa., John E. Shea, Attorney, Bureau of Internal Revenue, Washington, D. C., for Collector.

BARD, District Judge.

The Court is requested to allow a tax claim filed by the Collector of Internal·

Revenue and to set aside the report of a Special Master who recommended that the Government's tax claim be disallowed.

The Commissioner of Internal Revenue made an assessment for taxes against the Mifflin Chemical Corporation of Philadelphia, hereinafter referred to as "Mifflin". Subsequent thereto Mifflin filed a petition for reorganization under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207.

Judge Kirkpatrick approved the petition and referred the matter generally to the late David Werner Amram, Esq., as Special Master.

Based upon the assessment made by the Commissioner, the Collector of Internal Revenue for the First Collection District of Pennsylvania, filed a claim for taxes against Mifflin in the sum of $254,746.80. Mifflin filed exceptions to the claim.

Pursuant to the Court's order, Mr. Amram, the Special Master, held a number of hearings. He prepared a draft of his report, signed it, and on April 27, 1939 submitted it to all parties in interest for suggestions, under Rule VIII of the local rules in Bankruptcy.[1] Later Mr. Amram prepared a supplemental report. In it he incorporated certain Findings of Fact which were suggested by the Attorney for Mifflin.

This supplemental report has never been signed. Mr. Amram died June 26, 1939.

On July 8, 1939 the Court referred the matter to Special Master David Bachman.

Mr. Bachman filed his report on July 11, 1939 which report transmits (1) Mr. Amram's draft of his report; (2) the supplemental report which is unsigned; and (3) the suggested Findings of Fact prepared by counsel for Mifflin, which Mr. Amram adopted as part of his supplemental report. All of the hearings on the issues took place before Mr. Amram.

Mr. Amram in his report recommended that the tax claim of the Collector of Internal Revenue be disallowed. Exceptions were filed to the report by the Collector of Internal Revenue, and these exceptions are now before the Court.

The Government contends that Mifflin, through its agents, sold rubbing alcohol containing denatured alcohol in violation of laws and regulations pertaining thereto, subjecting this denatured alcohol to the same tax as alcohol that is not denatured.

A tax in the amount of $254,746.80 plus statutory interest was assessed under Section 2 of the Liquor Taxing Act[2] of 1934 and Section 4 of the Liquor Law Repeal and Enforcement Act[3] of 1935.

The one Act levied a tax of $2 a proof gallon on distilled spirits produced, and the other Act makes this tax applicable to denatured alcohol when sold in violation of the laws and regulations[4] in effect on August 27, 1935 and thereafter.

The first question to be determined is whether sales were made in excess of the reasonable requirements of the purchasers

---

[1] "A special master shall give notice to all parties in interest of the filing of his report in the clerk's office, and that exceptions may be filed thereto with the clerk within ten days after the date of such filing. Before filing his report, a master may submit a draft thereof to counsel for all parties for the purpose of receiving their suggestions."

[2] "Sec. 2. Paragraphs (3) and (4) of subdivision (a) of section 600 of the Revenue Act of 1918, as amended (relating to the tax on distilled spirits generally and the tax on distilled spirits diverted for beverage purposes) (U.S.C., Sup. VI, title 26, sec. 1150(a) (1) and (2), are amended to read as follows:

"(3) * * * (4) On and after the effective date of Title I of the Liquor Taxing Act of 1934, $2.00 on each proof gallon or wine gallon when below proof and a proportionate tax at a like rate on all fractional parts of such proof or wine gallon." Jan. 11, 1934, c. 1, Title I, Sec. 2, 48 Stat. 313, 26 U.S.C.A. § 1150(a) (1934 Edition).

[3] "Sec. 4. Any person who shall produce, withdraw, sell, transport, or use denatured alcohol, denatured rum, or articles in violation of laws or regulations now or hereafter in force pertaining thereto, and all such denatured alcohol, denatured rum, or articles shall be subject to all provisions of law pertaining to alcohol that is not denatured, including those requiring the payment of tax thereon; and the person so producing, withdrawing, selling, transporting, or using the denatured alcohol, denatured rum, or articles shall be required to pay such tax." Aug. 27, 1935, c. 740, Sec. 4, 49 Stat. 873, 27 U.S.C.A. § 153.

[4] Article 146 of Regulations 3, relative to industrial alcohol, as amended by Treasury Decision 4541, approved April 17, 1935, Volume 33, Treasury Decisions, Internal Revenue, 90, 93, after specifying the size of the containers for rubbing alcohol and the requisites for labels, provides as follows: "The sales of this product must be confined to persons legitimately engaged in a bona fide drug trade,

in violation of the regulations appended in the margin of note 4. If so, it would seem Section 4 of the Liquor Law Repeal and Enforcement Act would subject excessive sales of rubbing alcohol compound and the sellers thereof to the distilled spirits tax levied by the Liquor Taxing Act.

Harry Taback and David Muchnick were employed as salesmen by Mifflin to sell rubbing alcohol compound. Taback made his sales in New York City and Muchnick in Philadelphia. Taback in New York and Muchnick in Philadelphia would confer with alcohol racketeers who were diverting substantial quantities of rubbing alcohol compound. The words of Judge Biggs in his comprehensive opinion in Morgenthau v. Mifflin Chemical Corporation, 3 Cir., 93 F.2d 82, 86, which was a proceeding for the revocation of Mifflin's alcohol permit, very clearly describe the procedure pursued in the instant proceeding: "The procedure employed by these alcohol racketeers was to have the rubbing alcohol compound ordered from Mifflin by a jobbing house or store and then by fictitious sales cause the rubbing alcohol compound to, be delivered to themselves or their agents. The rubbing alcohol compound was picked up by trucks operated by these racketeers and delivered to so-called 'drop' houses."

The testimony of Samuel Waldman revealed the scheme between himself and Taback, Mifflin's New York sales agent, whereby during approximately four months the witness purchased 3000 gross of pint bottles (75,600 proof gallons) of rubbing alcohol from Mifflin through drug concerns. These drug concerns were selected and used by him and Taback for the purpose of deceiving the Government investigators that the product was being sold by Mifflin's sales agents for diversion into illegal channels. Waldman at the time he testified was serving a penitentiary term for conspiracy to violate liquor laws in which an illegal still was involved. The witness began to purchase rubbing alcohol prior to September 13, 1935. He became acquainted with Taback and they discussed arrangements for the purchase by Waldman of large quantities of rubbing alcohol and discussed plans to effect these purchases. They met quite a few times, had telephone conversations quite often, and discussed plans for the acquisition of rubbing alcohol by Waldman in such a manner as to keep the transactions free from suspicion. Taback expressed to Waldman a desire to work with him but was uncertain whether he could work exclusively with Waldman. Waldman testified they had "various discussions about ways and methods of working so that no trouble would come". They were concerned with making shipments indirectly to Waldman through concerns which would be of such character that they would stand an investigation by the alcohol tax unit of the Department of Revenue.

Waldman supplied Taback with the names of drug jobbers and among them were the Bee Drug Company and the Caswell-Massey Company of New York. In their conversations Waldman would tell Taback to ship rubbing alcohol to certain concerns, and Taback would inform him about orders he had. Taback would also inform Waldman when shipments of rubbing alcohol were supposed to be made from Mifflin and when such shipments would arrive, and the concerns receiving them. Waldman testified there were about twenty concerns in New York through whom he purchased rubbing alcohol and he named thirteen of them. These firms and the quantity of rubbing alcohol sold to them according to Mifflin's records are listed in Exhibit No. 1 introduced into evidence. This Exhibit discloses that during the last four months of 1935 Mifflin shipped 2845 gross pint bottles to these concerns that had been selected by Waldman and Taback and through whom were made these fictitious sales of the product that was being diverted into illegal channels.

The general procedure used by Taback and Waldman in effecting the sales to Waldman through legitimate concerns is described in Waldman's testimony relating to the Bee Drug Company. Waldman contacted Mr. Block of that company, and asked Block "whether he would purchase for me" rubbing alcohol. He and Block discussed the difficulty of getting shipments, and Waldman assured him that if Block placed the order there would be

---

or to hospitals, sanitariums, turkish baths, or other establishments or stores where such compounds have customarily been sold, or used for massage or other external purposes. Failure to comply with these requirements and to confine sales to such persons, or the making of sales to such persons in quantities in excess of their reasonable requirements will constitute bad faith on the part of the permittee and grounds for the revocation of his permit."

168

prompt shipment. Waldman would pay the concern cash in advance upon placing the order. A certified check was then sent with the order to Mifflin.

After placing the orders, Waldman would contact Taback and tell him about the orders being placed and would request him to see that the shipments were made immediately. Taback would assure Waldman that he would see that the shipments were made. After placing orders with the drug concerns and paying the required money Waldman would talk to Taback in order to be assured by Taback that the shipments would be made. Waldman expected Taback's help in getting the shipments and no orders were rejected after Taback said they would be shipped.

The shipments of rubbing alcohol from Mifflin would be picked up by Waldman at the drug company's place of business. Waldman would also give instructions to either the purchaser or to the Sunset Warehouse or to the Caravan Motor Company as to the delivery of the alcohol.

According to witness Block, of the Bee Drug Company, he purchased for Samuel Waldman 300 gross pint bottles of rubbing alcohol from Mifflin during the period from September 16, 1935 to November 27, 1935. The method used in covering the disposition of the rubbing alcohol by the purchaser is found in the testimony of Block. Block testified that all of the rubbing alcohol was sold to one person whose first name was Sam. However, Sam's name was not placed on the sales record. Instead, the truck driver, upon picking up the shipment, would give Mr. Block a list of various stores where the alcohol was supposed to be taken. Block would then enter upon his sales records the names of the concerns given by the truck driver.

Taback himself advised another customer to make similar false records. This was testified to by Alexander Mintz of the Ross Products Company, in which he quotes Taback as telling him: "It is not wise to bill it out that way, in such large quantities * * *. If I were you I would split it up into smaller shipments and make more bills out for it in smaller lots."

Waldman also referred to purchases made through the Caswell Massey Company. Before approaching this concern Waldman contacted Taback for his opinion of the concern and Taback said he thought it was a good concern. Waldman learned that the concern was highly rated financial-ly, and at his instructions the concern sent in an order to Mifflin for 100 gross of rubbing alcohol. The procedure thereafter was much the same as that of the Bee Drug Company. The shipments were picked up by Waldman at the Sunset warehouse, and the alcohol never went to the Caswell Massey Company's place of business. After the first shipment Waldman talked to Taback and was told that he (Taback) had gone to Caswell Massey and learned they were merely a drug store, and he, Taback, thought that they were unable to show proper disposition of such large quantities of rubbing alcohol. Upon this information Taback decided not to ship such large quantities to them in the future, but would send smaller shipments and a few smaller shipments were made.

This evidence shows Taback was cooperating with Waldman in the placing of orders for the indirect sales of rubbing alcohol to Waldman. The concerns in whose names the orders were actually placed were placing the orders upon the instructions of Waldman, and this procedure was with the full knowledge of Taback. Taback was concerned with regulating the size of the shipments to the purchasers, so that the quantities shipped would not look suspicious to the government investigators. The cutting down of the shipments to Caswell Massey, with knowledge by Taback that even the small shipments were destined to reach Waldman, sustains this conclusion. There was no consideration of the legitimate need of the concern for any quantity of rubbing alcohol, but there was an arrangement between Waldman and Taback that regardless of the size of the order, it was only placed on behalf of Waldman for illegal purposes.

Evidence of this is found in the testimony of Waldman that Taback was interested in getting new firms, which concerns should be in business, and would be of such character as to stand investigation by the Alcohol Tax Unit, the object being to have a lot of new accounts, so that the orders could be split into smaller groups.

An explanation of the cutting down in the size of the orders to avoid suspicion is contained in the following statement of Waldman relating to one of the discussions between him and Taback: "A. I think it was in November that the Alcohol Tax Unit started to take a check-up on all these big shipments coming into these various concerns, and we had talked about cutting these 100 gross and 200 gross orders out,

and distributing them among more customers of say 15, 20 and 25 gross shipments."

This statement, together with the foregoing testimony, when stripped of the fictitious commercial paper transactions, shows that Mifflin, through its agent Taback, was selling rubbing alcohol direct to Waldman, the representative of the bootleggers, and that the concerns which appear as the purchasers were in fact only media used by Taback and Waldman to give the sales a legitimate aspect and mere channels through which flowed this rubbing alcohol, from Mifflin's agent to the bootleggers' representative, by pre-arrangement between them, to be diverted for illegal purposes. The purpose of this procedure was to deceive the government investigators. Contentions of Mifflin that sending smaller shipments was for the purpose of keeping within the reasonable requirements of such concerns fail in the face of the disclosure that the real purpose was to clothe this scheme of diversion with the semblance of legality.

There was a great demand at this time for large quantities of rubbing alcohol, and Mifflin could not fill all orders. During this period there was an enormous increase in Mifflin's business. The normal withdrawal of denatured alcohol by Mifflin during January and February 1935 was 32,000 gallons monthly. Thereafter the monthly withdrawals increased, reaching a peak of 100,000 gallons in June of 1935, in July 40,000, and from August to December 1935 the withdrawals remained at 64,000 gallons per month. Mifflin took advantage of this unusual demand created by the illegal use of rubbing alcohol, and rapidly increased the price of its product. The rapid rise in the price of rubbing alcohol is illustrated by the prices Mifflin charged the Bee Drug Company. On September 16, 1935 the price was $11.25 per gross. On October 2, the price increased to $12.25 per gross, and on November 2 to $13 per gross. In this connection Waldman informed Taback, "I remember telling him if the prices on rubbing alcohol got much higher, the bootleggers will be forced to stop using it."

Taback's knowledge of the diversion of the alcohol sold by Mifflin is further emphasized in the testimony. Waldman testified several times that Taback was apprehensive about getting into trouble through these illegal transactions. In an endeavor to show that agent Taback's interest was adverse to his principal Mifflin, Waldman was asked several times on cross-examination whether he and Taback had not attempted to conceal their machinations from Mifflin. While there appeared some inconsistency, a careful reading of the witness' entire testimony discloses that his testimony on this point can be summed up by the following question and answer on cross-examination:

"Q. What I want you to tell the Referee frankly is, what you and Mr. Taback were doing was trying to keep from the Mifflin Chemical Corporation any information about you, or what was being done with this alcohol. Isn't that so? A. I don't think so."

This evidence stands uncontradicted.

Waldman testified that he purchased only Mifflin's rubbing alcohol of the brand known as "Browns" and in all of these transactions he dealt only with Taback.

Taback received no compensation whatsoever from Waldman for making these indirect sales to him. Taback's only compensation came from his principal Mifflin. Taback's advantage in dealing with Waldman is expressed by the witness: "A. The advantage he got was he felt assured that anything I was buying of Mifflin had a better chance of not getting into the department's hands than if a customer had twenty or thirty people running in there with machines, sedans and trucks and everything else to pick up the alcohol."

The advantage to Taback in dealing with Waldman also accrued to his principal. Taback, the agent, selected customers for his principal, was compensated only by his principal, and took every step he deemed necessary to shield his principal from the tax liability for such sales made in violation of government regulations. Taback's interest was with and not against that of his principal.

The method used by Mifflin in disposing of its product in the Philadelphia area was practically identical with that used in the New York area. In Philadelphia the salesman for Mifflin was David Muchnick. The persons ultimately receiving the product were Glanzburg, Goldstein, alias Gold, and Fisher. These persons were engaged in the business of acquiring rubbing alcohol on behalf of Sam Shickman and George Nathans. Glanzburg purchased rubbing alcohol from Mifflin through various concerns with the full knowledge, assistance and connivance of Muchnick.

Both Glanzburg and Gold pleaded guilty in the conspiracy trial in this court involving the diversion and illegal redistillation of Mifflin's rubbing alcohol, so that the illegal destination of the product acquired by them is a matter not now open to question.

Glanzburg had been buying rubbing alcohol and about September 1935 he opened the Quaker City Jobbing House and purchased about 2,000 gross pint bottles of rubbing alcohol during September and October. His method was to induce drug stores to place orders for rubbing alcohol, and he would make deposits on the orders placed. When the product arrived at the drug stores in the Mifflin trucks, the drug store operators would keep the Mifflin truck waiting until Glanzburg arrived and completed the payment. At times the merchandise was left on the pavement and hauled away from there in Glanzburg's truck to warehouses. He bought brands of rubbing alcohol manufactured by three companies. However, the greater quantity purchased was Mifflin's product. Glanzburg knew Muchnick for several years and knew Muchnick sold to the big accounts Glanzburg solicited. Further evidence that Muchnick knew Glanzburg's business is inferred from the fact that Glanzburg tried to induce Muchnick to give him preference over his competitors. Muchnick's knowledge of the illegal demand for rubbing alcohol also came to him from other sources. He was offered from $1.00 to $1.25 above the market price to sell to other persons who were competing with Glanzburg in the acquisition of rubbing alcohol. Glanzburg also testified that he gave Muchnick 25 cents a gross on purchases made through local drug stores. This payment was termed as a "gift", which Muchnick reluctantly took after considerable insistence on the part of Glanzburg. Glanzburg would meet Muchnick at various drug stores, particularly at Newhoff's. On one occasion Glanzburg told Muchnick about placing an order with Newhoff, and Muchnick told Glanzburg that he would do his best to get the order filled. Muchnick would inform him when certain firms would receive shipments. In August 1935 Muchnick went with Glanzburg to the Lorraine Hotel for the purpose of convincing George Nathans that Glanzburg had connections with the Mifflin Company. Nathans had plenty of money to buy rubbing alcohol. Two weeks later Glanzburg opened the Quaker City Jobbing House, on money supplied by Nathans, and began to buy rubbing alcohol for Nathans. In November 1935 Glanzburg joined with Lou Gold and began to operate under the name Three Star Chemical Company using money furnished by Sam Shiekman. While operating at the Three Star Chemical Company, Glanzburg and Gold purchased from 1800 to 2000 gross per month of rubbing alcohol. This was during November and December of 1935. Muchnick visited Glanzburg at the Three Star Chemical Company, and they also held telephone conversations. Glanzburg and Muchnick arranged for a meeting between Muchnick, Gold and Mr. Trainer of Hance Brothers and White, relating to the placing of an order by Hance Brothers and White with the Mifflin Company for 1000 gross of rubbing alcohol. The witness named a number of concerns through whom he purchased Mifflin rubbing alcohol, although he could not recall the names of all of them. When Newhoff threatened to stop selling rubbing alcohol, Muchnick arranged a meeting between an unnamed official of the Mifflin Company and Newhoff for the purpose of inducing Newhoff to continue to buy rubbing alcohol on behalf of Glanzburg.

Louis Goldstein, also known as Lou Gold, corroborated the testimony of Glanzburg relative to engaging in the business of buying rubbing alcohol, under the trade name of the Three Star Chemical Company. Glanzburg paid Gold from 25 to 50 cents for each gross purchased by Gold. Gold in turn employed Barney Fisher and paid him 10 or 15 cents a gross for all orders that he, Fisher, could get.

The specific quantity of Mifflin's rubbing alcohol purchased by Glanzburg and Gold is not shown on the record before the Master. This was due, contends Government counsel, to the Master's ruling refusing to allow customers to testify to whom they sold Mifflin's product, and also to the ruling that Glanzburg could not give his best judgment of the quantity of Mifflin's product purchased through the Three Star Chemical Company. Certain rulings of the Master, as mentioned in Exception No. 8, precluded the admission of the testimony of customers as to the exact quantity of rubbing

alchohol they purchased from Mifflin on behalf of or for the purpose of reselling to the representatives of the bootleggers. Counsel for the government contends these customers had records from which they could testify as to the exact quantity purchased and sold, whereas the representatives of the bootleggers, Glanzburg, Gold and Waldman, on whose behalf the purchases were made, did not keep such records, and when they testified they had to rely solely on their memory as to the quantity purchased. I think this was error on the part of the Master. I think this testimony would have clearly revealed the amount of alcohol in excess of their reasonable requirements that flowed through these customers from Mifflin to Waldman and Glanzburg for illegal purposes.

Notwithstanding the Master's exclusion of this evidence, it has been shown that Glanzburg of Philadelphia purchased at least 1000 gross pint bottles of Mifflin, Gold 260 gross and Waldman of New York 2720 gross. Waldman testified that he purchased 3000 gross of pint bottles of Mifflin rubbing alcohol. Exhibit 1 shows according to Mifflin's records that Mifflin shipped to the New York area during this period 2845 gross, while a later memorandum submitted to the Master by agreement of counsel showed a correct tabulation of the sale of rubbing alcohol involved in this case in the New York area to be 2720 gross. Waldman's testimony of 3000 gross stands uncontradicted as the amount he purchased for illegal diversion and the amount sold by Mifflin's agents to customers in the New York area in excess of their reasonable requirements. The figure of 2720 gross is corroborative evidence of Waldman's testimony showing that at least that amount, approximating the amount to which he testified, passed through their hands. Since no one has contradicted Waldman as to the purposes for which he purchased this alcohol by pre-arrangement with Mifflin's agent Taback, I find that at least 2720 gross pint bottles were furnished these concerns in the New York area in excess of their reasonable requirements.

Glanzburg of Philadelphia testified that he purchased 500 gross a week for the first two weeks in the months of September and October of 1935, or a total of 2000 gross. The greater portion of these purchases of Glanzburg's was Mifflin's products and this amounts to at least 1000 gross.

██ Gold testified that he purchased 40 gross from Sears-Roebuck, 50 or 75 gross from Frank and Seder, 60 or 75 gross from Post Cut Rate Stores, 20 or 25 gross from Lakoff, Second and Third Streets and 90 or 95 gross from Hance Brothers and White, which figures range from 260 to 310 gross. I will reject the government's claim for tax on the 260 gross purchased by Gold from the firms listed above because unlike the pre-arrangements existing between Glanzburg and Muchnick, the evidence does not absolutely disclose that Mifflin's agent Muchnick had any pre-arrangement with Gold to use these concerns as media for the purpose of supplying Gold with rubbing alcohol to be diverted to illegal uses. I hold that these 260 gross, although they were diverted for illegal purposes and therefore in excess of the customers' reasonable demands, were sold by Mifflin to these customers in a bona fide manner without any knowledge on the part of Mifflin or its agents that this alcohol would be diverted for illegal purposes. The record discloses that Gold, Muchnick and two other men, dealers in rubbing alcohol, had a conference and from all the other evidence and facts in this case the inference might well be drawn that Muchnick and Gold conferred concerning the furnishing of rubbing alcohol. The evidence of Gold on this point, however, is not so clear as was that of Glanzburg. For that reason I am constrained to feel that the testimony produced by the government concerning these 260 gross is not so free from doubt as would justify a finding that Mifflin or its agents had violated the regulations pertaining thereto.

██ Glanzburg testified to the effect that while operating the Three Star Chemical Company he and Gold purchased 1800 or 2000 gross per month or a total of 3600 to 4000 gross. This quantity must be excluded because the record does not show definitely how much of this was Mifflin's product, because the Master refused to permit the government to introduce evidence on this point, although the evidence does show that during the period in which these purchases were made by Glanzburg he was handling "The same products as before" and

was in close communication with and was paying Muchnick for his assistance in procuring Mifflin's product.

I must conclude from the evidence that Mifflin, through its sales agents, Taback and Muchnick, sold at least 3720 gross pint bottles of rubbing alcohol, 2720 gross in the New York area and 1000 gross in the Philadelphia area, directly or indirectly to the representatives of bootleggers; that Mifflin's sales agents knew that the orders were placed by customers for or on behalf of bootleggers or for the purpose of reselling this rubbing alcohol to bootleggers; that Mifflin's agents knew that the rubbing alcohol shipped to these customers would be delivered either directly or indirectly to bootleggers and would not be applied to the reasonable requirements of the customers; and that the alcohol so sold was therefore in excess of the reasonable requirements of these customers.

These findings of fact are not at variance with those found by the Special Master, although he reached a different legal conclusion than I do. On page 33 of his report appear these findings: "But the only evidence that was offered is that two salesmen of the debtor corporation, one Muchnick in Philadelphia, and one Taback in New York obtained knowledge that the persons whose orders they took and transmitted to their principal, were selling part of the merchandise to bootleggers. This knowledge of the salesmen, Muchnick and Taback, is imputable, so it is argued, to the Mifflin Company, and hence is proof that the Mifflin Company sold to its purchasers in excess of their reasonable requirements. Certainly it cannot be said to be a reasonable requirement of a druggist to acquire rubbing alcohol compound to be sold to bootleggers who will use it for illegitimate purposes. Now from the evidence it is possible to find that Muchnick in Philadelphia and Taback in New York knew that some of the rubbing alcohol compound shipped by the debtor corporation to its customers was diverted to bootleggers. This is sufficient, according to the argument on behalf of the claimant, to subject the debtor corporation to taxation on such sales."

I take it the Master concluded the evidence shows Mifflin's sales agents sold its products to Mifflin's customers in quantities in excess of the reasonable requirements of the customers, but that Mif- flin itself did not make such excessive sales because the acts of its agents are not imputable to the corporation. This brings us to the determinative question of the case—whether the acts of its agents, which constituted a violation of the regulations set forth in note 4, are imputable to Mifflin. The Master found this to be the real issue and so stated it on page 33 of his report, as follows: "There is no proof offered by the claimant that the debtor corporation had any knowledge of these illegitimate sales by their customers. The claimant contends however that the knowledge acquired by Muchnick and Taback in their respective territories is ipso facto knowledge acquired by the debtor corporation. This is really the basic fact in the case, and unless it can be established, as a matter of law, the claim of the Collector of Internal Revenue to the tax must fall."

On page 34 the Master, I think correctly, stated the law of agency as follows: "There is of course a fundamental rule of law that where knowledge is acquired by an agent in the course of his agency and relates to matters concerning the business, which the agent was authorized to conduct on behalf of the principal, such knowledge acquired by the agent is imputable to the principal. But if the agent was perpetrating a fraud on the principal, acting for his own benefit, and not for the benefit of his principal, the rule would not apply."

Before discussing the law of agency whether knowledge acquired by the agents was imputed to the principal, I must refer to some findings of fact of the Master with which I can not agree.

I am mindful that the findings of a Special Master, Referee or Trial Judge will not be disturbed where there is substantial evidence to sustain the findings. Roberts v. Southern Surety Co., 4 Cir., 33 F. 2d 501; Wald v. Longacre, 3 Cir., 34 F. 2d 25; Wingert v. President, etc., of Hagerstown Bank, 4 Cir., 41 F.2d 660; Kline v. H. Poleskin & Son et al., 4 Cir., 46 F.2d 998; In re Rubins, 7 Cir., 74 F.2d 432.

On page 34 of his Report the Master found: "No knowledge of these transactions was acquired by the debtor corporation from these sales agents Muchnick and Taback * * *". It seems to me there is no evidence in the record upon which such a finding could be based. Neither the agents nor any person connected with Mifflin testified in the case. No one testified

whether the agents did or did not notify Mifflin. Any findings must therefore be inferred from the actions of the parties. As will be hereafter discussed, the law presumes that the agents informed their principal and there is no evidence in the record to rebut this presumption.

The Master in his report on page 35 found: "Assuming that they (the agents) were assisting the druggists in obtaining the rubbing alcohol from the Mifflin Company so that the druggists might be able to resell the rubbing alcohol to the three persons who were unlawfully diverting it, the Mifflin Co. cannot be presumed to know that which in fact they did not know, nor can such knowledge of the salesmen be imputed to their principal." There is no evidence in the record to support the finding that "in fact they (Mifflin) did not know."

The Master on page 35 made a similar finding as follows: " * * * the Mifflin Company did not know anything about the diversion of the product which it had lawfully sold." I can find no testimony which would support such a finding. On the other hand, exclusive of the legal presumption, there is substantial evidence that Mifflin had knowledge. During the period involved there was a great demand for large quantities of rubbing alcohol. Mifflin's business tripled from February to June 1935, and remained double thereafter. Mifflin withdrew 32,000 gallons of denatured alcohol in January and February 1935. These withdrawals increased to 100,000 gallons in June, and from August to December the withdrawals remained at 64,000 gallons per month. (See Exhibits.)

Concurrent with this increase in business, Mifflin raised the price of its products from $11.25 to $13 per gross and then was unable to fill all orders.

This information Mifflin had in its own records. I have not examined the record in the case in which Mifflin's alcohol permit was revoked, but the language used by the Circuit Court of Appeals in the opinion by Judge Biggs in that case, Morgenthau v. Mifflin Chemical Corporation, 3 Cir., 93 F. 2d 82, 86, could be used as proper comment in the instant case: "It seems to us, however, that even a superficial checkup of customers of the appellee by these officers would have disclosed the nature of the sales made and have satisfied Brown and Publicker [Mifflin's officials] that rubbing alcohol compound was being sold in quan-

tities far beyond the reasonable requirements of the appellee's customers and that the alcohol was, in all probability, being made subject to diversion." And again on page 88 of 93 F.2d the Circuit Court of Appeals said: "It appears from the record that some of the small houses dealing in large quantities of the rubbing alcohol compound manufactured by the appellee were aware that the alcohol so purchased by them was probably being put to illegal uses. We cannot believe that the appellee itself did not have knowledge equal to that of its purchasers of the market conditions under which its product was being sold."

The testimony shows that Taback in New York and Muchnick in Philadelphia pursued similar schemes in diverting Mifflin's rubbing alcohol. I am compelled to reject the finding of the Master that Mifflin did not have knowledge of the diversion of its product because such a finding is unsupported by the evidence.

The evidence relative to the rapid increase in the amounts of rubbing alcohol sold, the increase in price, the inability to fill the orders, and the similarity of the schemes in Philadelphia and New York, would strengthen the unrebutted presumption of law that the agents did inform the principal, and it would not be unfair, if necessary for the determination of this case, to conclude that Mifflin knew that its product was being diverted into illegal channels. Such a construction would also be supported by the fact that Mifflin failed to offer testimony asserting that it did not know of the illegal action of its agents.

Whether or not Mifflin had actual knowledge, I can find no evidence to support the finding of the Master that Mifflin did not have knowledge of the diversion of its product.

There was evidence that in addition to the regular sales commission that Muchnick received from Mifflin, Glanzburg paid Muchnick a commission from November 1935 to Christmas in appreciation of favoring him. The Master used this as a basis for the conclusion that the interests of the agents were adverse to the principal and for invoking the exception to the agency rule. I do not think this interfered with the agency relationship between Muchnick and Mifflin. Muchnick had been selling alcohol to be diverted by Glanzburg from August 27 to the end of November 1935, and had been compensated solely by Mifflin. It is well settled that a principal

is responsible for the acts of its agents acting within the scope of their authority. The evidence discloses that the agents for Mifflin effected sales of rubbing alcohol to be diverted by Glanzburg and Waldman. Mifflin introduced no evidence that, in making the sales of rubbing alcohol, Muchnick and Taback were acting without the scope of their authority.

I have deemed it necessary to advert to the testimony at some length to give my reasons for rejecting some of the findings of fact and to form a factual basis for my legal conclusion.

In United States v. Wilson, et al., D.C., 59 F.2d 97, Cathro, sales agent for a yeast company, sold yeast to Wilson knowing that Wilson was engaged in the illicit manufacture of liquor. There was no proof that the yeast company knew of the criminal act of its agent Cathro, but it was found by the Court to be criminally responsible for the acts of its agent. In its opinion the Court said, page 99 of 59 F.2d: "And, when the acts of the agent are in furtherance of, and in the course of his employment he sells a specially prepared commodity in the manner and method for the purpose shown, the act becomes actionable, and the penalty of the law becomes fixed against the defendant corporation, as well as the agent. See Aikens v. Wisconsin, 195 U.S. 194, 25 S.Ct. 3, 49 L.Ed. 154; Swift & Co. v. United States, 196 U.S. 375, 25 S. Ct. 276, 49 L.Ed. 518. Fidelity & Deposit Co. of Maryland v. Commonwealth of Pennsylvania, 240 U.S. 319, 36 S.Ct. 298, 60 L.Ed. 664."

In Zito v. United States, 7 Cir., 64 F.2d 772, the question arose as to the responsibility of the corporation in a conspiracy case for the acts of its sales agent in selling corn sugar to persons engaged in violating the prohibition laws. This case is very similar to the instant case, although it was a criminal case. In the case at bar the agents of Mifflin sold denatured alcohol to persons intending to use the same for producing taxable alcohol. In the Zito case sales agents for the corporation sold sugar to persons intending to use the same for manufacturing taxable alcohol. In the Zito case the corporation contended that it was engaged in a legitimate business and that all the transactions were legitimate, and that if a conspiracy existed, it had no knowledge thereof and was not a party thereto. On this point the Court said, page 775 of 64 F.2d: "Corporations speak and act through their agents. There is abundant proof in the instant case that one McNamara was an agent of the appellant company and that he had authority to sell its products. Therefore, it naturally follows that his actions in contacting and selling the individual appellants and the Capitol Products Company are binding upon appellant company."

In the above cases the corporations were held criminally responsible for the acts of their salesmen in supplying yeast and sugar to the illegal liquor trade. This is a civil case. I see no reason why the responsibility of a corporation in tax matters should be less than its responsibility in criminal matters.

Aetna Life Insurance Co. v. Mutual Benefit Health & Accident Association, 8 Cir., 82 F.2d 115, was an action for libel. A general agent for the Aetna Company sent out a letter to its sub-agents. The Aetna Company contended the letter by its agent was not within the scope of his employment. The Court said at page 120 of 82 F.2d: "A corporation is liable for the acts of its agent, either in contract or tort, done or committed in the course of employment in the business of the corporation. Aetna Life Ins. Co. v. Brewer, 56 App.D.C. 283, 12 F.2d 818, 46 A.L.R. 1499; Buckcye Cotton Oil Co. v. Sloan (C.C.A. 6) 250 F. 712. * * In issuing instructions, suggestions, and information to its subagents, Buchanan was acting within the scope of his employment. The fact that, in executing this work, he may have exceeded or violated his master's instructions cannot aid appellant. This court, speaking through Judge (now Mr. Justice) Vandevanter, has aptly announced this rule: 'A master is responsible for the tortious acts of his servants, done in his business and within the scope of their employment, although he did not authorize or know of the particular act, or even if he disapproved or forbade it. * * * Servants do not depart from the scope of their employment * * * merely because, in executing the work assigned to them, they exceed or violate their instructions in respect to its details or the manner of doing it.' Western Real Estate Trustees v. Hughes (C.C.A. 8) 172 F. 206, 210."

In VonSchrader v. Milton et al., 96 Cal. App. 192, 273 P. 1074, arising in a California state court, plaintiff claimed she was induced to pay for certain stock on misrepresentations made by agents of the defendant corporation to the plaintiff. Defendant cor-

poration claimed it did not authorize or know of the fraud or deceit and that the agent was acting for his own benefit. The District Court of Appeal said, 96 Cal.App. 192, 273 P. page 1078: "* * * As a corporation can only speak or act through its agent, there is stronger reason for holding it answerable for the acts and representations of the agent done within the ostensible scope of his authority and while transacting the business of the principal, than applies when the principal is a natural person. A corporation is liable for the fraud and deceit of its officers and agents, acting in the apparent course of their employment, although it did not authorize or know of the fraud or deceit, and although it may have been committed by the officer or agent for his own benefit. Fletcher, Cyc. Corp. vol. 5, § 3346. 'In such cases the doctrine of ultra vires has no application, for it would be a travesty on justice and common honesty to permit a corporation, whether private or quasi-public, to participate in a fraud and to benefit therefrom and then escape liability on the ground that the act was not that of the corporation itself, but its officers who were in control thereof.' Thompson on Corporations (2d Ed.) vol. 5, § 5474."

In Kean v. National City Bank, 6 Cir., 294 F. 214, 219, the Court said:

"* * * unquestionably the general rule is that notice to the agent as to any transaction within the scope of his authority is to be considered as notice to the principal. This rule is most frequently said to be 'based on the principle of law that it is the agent's duty to communicate to his principal the knowledge which he has respecting the subject-matter of negotiation, and the presumption that he will perform that duty.' The Distilled Spirits, 11 Wall. [356] 367, 20 L.Ed. 167. There is, however, a well-established exception to the operation of this general rule, wherever the agent is shown to have been engaged in a private enterprise for the purpose of defrauding the principal or others. Then it is said that it cannot be presumed that the agent will communicate to the principal the facts which would convict the agent of an attempt to deceive and defraud the principal. Thomson-Houston Electric Co. v. Capitol Electric Co., 65 F. [341] 343, 12 C.C.A. 643 (C.C.A. 6).

"But it is contended that there is no room for the application of the principle of this exception where the agent is the sole representative of both parties in the transaction, or, in other words, the 'sole actor' on behalf of the principal. Then it is said that, although the agent has an interest in concealing his fraudulent knowledge, and presumably did not disclose it to his principal, yet since corporations can acquire knowledge only through their agents, and since the fraudulent agent was the sole representative of the corporation in the transaction, his knowledge must, of necessity, be considered that of the corporation as well as that of the other party interested in the transaction, viz. himself or his confederates in fraud. Otherwise, the corporation could not be held to have acquired any knowledge whatever as to the specific matter in which it has, through its agent, participated. * * *

"Another general theory advanced to sustain the proposition that the principal is charged with notice to the agent—'finds the reason of the rule in the legal identity of the agent with the principal, during the continuance of the agency, in the fact that the agent, while keeping within the scope of his authority, is as to the matters embraced within it, for the time being the principal himself, or, at all events the alter ego of the principal, the principal's other self. * * * Whatever notice or knowledge, then, reaches the agent during this time and under these circumstances, in law reaches the principal, whether it does so in fact or not.' 2 Mechem on Agency (2d Ed.) § 1805."

The Court summarizes this view on page 221 of 294 F.: "If the agent was active on behalf of the principal in accomplishing the result complained of, and if, in so doing, he was acting within the scope of his authority, this would be made the predicate of liability, whether he was fraudulent or not, or whether or not he had personal ends to subserve."

The evidence in this case discloses that Taback and Muchnick were acting within the scope of their authority. Mifflin, the principal, is therefore responsible for their actions even though it did not specifically authorize or know of these actions.

In Beaudry v. United States, 5 Cir., 106 F.2d 987, an automobile salesman colluded with a known liquor violator to place the automobile title in the name of a third party whose signature was forged. This collusion was done without the knowledge of the salesman's principal, but the Court held that the knowledge and action of the agent were imputed to the principal and that the principal's personal innocence and ignorance of the fraud and forgery were immaterial. The Court said, page 988 of 106 F.2d:

"* * * appellant is here insisting that the case the facts make is one for the application, not of the principle of imputed knowledge, but of the exception to it, in that here, the agent was acting not in the interest of his principal, but adversely to, and in fraud, of him.

"This will not do. Though improperly, and as it turned out, mistakenly, Yeager was acting in the interest of and not adversely to, his principal. The sale he made was intended by him to be, and if his scheme had worked out it would have been to his principal's benefit. The fact that the desire to get a commission may have induced him to take a chance, which but for it he would not have taken, in no manner characterizes his action as against, rather than in, his principal's interest, within the rule appellant invokes. Here, his every action, misguided and mistaken though it was, was intended for his principal's benefit. The rule to be applied here, where appellant has delivered the car and has taken the benefit of his agent's acts in making the sale, by taking its proceeds, is, that he cannot take the benefits of the act, without also taking the burdens resulting from the agent's knowledge and intentions. Curtis Collins & Holbrook Co. v. United States, 262 U.S. 215, 43 S.Ct. 570, 67 L.Ed. 956; Morris v. Georgia Loan Co., 109 Ga. 12, 34 S.E. 378, 46 L.R.A. 506; Connecticut Fire Insurance Co. v. Commercial National Bank of San Antonio, 5 Cir., 87 F.2d 968."

In Bowen v. Mount Vernon Sav. Bank et al., 70 App.D.C. 273, 105 F.2d 796, 799, the Court said: "The real reason for the rule which charges a principal with his agent's knowledge is simply the injustice of allowing the principal to avoid, by acting vicariously, burdens to which he would become subject if he were acting for himself. The so-called presumption that the principal knows what the agent knows is irrebuttable; it cannot be avoided by showing that the agent did not in fact communicate his knowledge. It should follow that it cannot be avoided by showing that the agent had such an adverse interest that he would not be likely to communicate his knowledge. In general, 'Notice should be imputed wherever there is agency or ratification.' Certainly where, as in this case, it does not appear that the agent acted unfairly toward his principal, or even that he would have derived any advantage from doing so, the principal should be charged with the agent's knowledge."

See also Neal v. Pender–Heyman Hardware Co. 122 N.C. 104, 29 S.E. 96–97, 65 Am.St.Rep. 697; Hughes v. National Equipment Corporation, 216 Iowa 1000, 250 N.W. 154, 157; Independent Shope Brick Co. v. Dugger, Tex.Civ.App., 281 S.W. 602.

In Distilled Spirits, 11 Wall. 356, 78 U.S. 356, 366, 20 L.Ed. 167, the principal authorized his agent to purchase distilled spirits. The agent, without knowledge of the principal, purchased distilled spirits upon which the tax had not been paid. The United States filed a libel against the distilled spirits and the principal, Harrington, claimed them alleging that he was without knowledge of the fraud perpetrated by his agent Boyden. The District Court Judge charged the jury that if Boyden bought the spirits as agent for Harrington and was cognizant of the fraud, Harrington would be bound by his agent's knowledge. The Supreme Court said, page 367 of 11 Wall., 20 L.Ed. 167: "The general rule that a principal is bound by the knowledge of his agent is based on the principle of law, that it is the agent's duty to communicate to his principal the knowledge which he has respecting the subject-matter of negotiation, and the presumption that he will perform that duty." The Supreme Court further said on page 368 of 11 Wall., 20 L.Ed. 167: "The fair construction of the charge is, that if the jury believed that Boyden, the agent, was cognizant of the fraud at the time of the purchase, Harrington, the principal, was bound by this knowledge."

In the above case the agent purchased liquor in fraud of the tax. The principal denied knowledge of the fraud but such knowledge was imputed to him. In the instant case the agents, acting within their authority, sold rubbing alcohol for a taxable purpose in fraud of the tax. The facts are identical except in the one case the agents are purchasing and in the other selling. In the instant case the Government's contentions appear to have a firmer basis because Mifflin has not denied, as did Harrington in the other case, receiving the knowledge the agents are presumed to have transmitted to it. See also Suit v. Woodhall, 113 Mass. 391, 395.

In the instant case there is no proof that the agents Taback and Muchnick did not inform Mifflin as to their knowledge of the intended use of the product they sold on behalf of Mifflin. Therefore, the legal presumption that Mifflin was actually informed must stand because there is no evidence in the record to rebut it. Not a word of denial

came from Mifflin or its agents or any one else. Under the above theory, it would not be necessary to invoke the other proposition of law, clearly applicable here, that even though the principal was not actually informed, the knowledge of the agents would be imputed to the principal. Under either theory Mifflin is charged with the knowledge of its agents and its liability for the taxes in question is established.

 Counsel for Mifflin contends, however, that under Article 146 of Regulations 3, as amended by Treasury Decision 5541, relative to industrial alcohol, cited in the margin under Note 4, sales in excess of reasonable requirements are not taxable. He argues that Article 146 does not forbid sales in excess of reasonable requirements but merely states that such sales would constitute bad faith on the part of the vendor and cause for the revocation of his permit, but that no tax would be imposed on such sales. It is true no tax could be imposed by a Treasury regulation and could not be imposed in the absence of a specific Act of Congress. The argument advanced on behalf of Mifflin, however, overlooks the provisions of the Liquor Law Repeal and Enforcement Act, c. 740, Sec. 4, 49 Stat. 873, 27 U.S.C.A. § 153, which provides that a person who sells denatured alcohol in violation of regulations now or hereafter in force shall be required to pay tax thereon. I have found as a fact that Mifflin made sales of rubbing alcohol to "persons in quantities in excess of their reasonable requirements" in violation of the regulations then in force. Such violation brings these sales within the taxing provisions of the Act cited above.

Counsel for the Collector of Internal Revenue have filed 38 exceptions to the report of the Special Master. Three of these exceptions are as follows:

"15. The learned Master erred in failing to find that all rubbing alcohol sold by the debtor to its customers, which the debtor knew, through its sales agents, was being purchased on behalf of bootleggers, or would be resold to bootleggers, were sales in excess of the reasonable requirements of the said customers.

"21. The learned Master erred in finding (Report, page 34) that the debtor corporation acquired no knowledge of the illegitimate sales of rubbing alcohol effected on behalf of the debtor by its agents, Muchnick and Taback, when there is entirely no evidence from which this finding could be made.

"24. The learned Master erred in finding (Report, page 33-4-5 and supplemental findings 4 and 11) that the debtor corporation did not know and did not acquire from either of its agents, Muchnick or Taback, or from any of the customers, the knowledge that the rubbing alcohol sold by the debtor to its customers was being diverted to an illegal use, when there is entirely no evidence from which this finding could be made, and further, that there is no evidence to rebut the presumption of law that the agents' knowledge was transmitted to the principal."

These three exceptions to the Master's Report are sustained. This ruling and the views I have expressed in my opinion obviate the necessity of making separate rulings on the other thirty-five exceptions.

I have found that Mifflin through its sales agents sold at least 3720 gross pint bottles of rubbing alcohol in excess of the reasonable requirements of its customers. Each gross contains eighteen wine gallons of rubbing alcohol, which amounts to 66,960 wine gallons. Each wine gallon contains 1.4 proof gallons, or a total of 93,744 proof gallons. Multiplying this figure by the legal tax of $2 per proof gallon produces a result of $187,488 as the amount of tax due on this alcohol.

It is ordered that the Report of the Master be set aside, and the tax claim made by the Collector of Internal Revenue for the First Collection District of Pennsylvania against the Mifflin Chemical Corporation be allowed to the amount of $187,488, together with interest at one-half per centum per month from January 15, 1938.